IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| ROBIN G. SHERBON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 05-3573-CV-S-ODS |
| ) | |
| JO ANNE BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION
DENYING DISABILITY INSURANCE BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability benefits under Title II of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in March 1954 and has prior work experience as a salesman. At the age of fifteen, a physical revealed he suffered from a heart murmur and atrial septal defect.[1] Surgery was recommended, but Plaintiff's parents were unable to afford the cost of the procedure and Plaintiff was not able to obtain insurance covering this pre-existing condition.

---

[1] According to a website maintained by the American Heart Association, atrial septal defect is, essentially, a hole between the two upper chambers of the heart. This affects the circulatory system's ability to deliver oxygen to the rest of the body. http://www.americanheart.org/presenter.jhtml?identifier=11065 (visited July 12, 2006).

Nonetheless, Plaintiff worked as a salesman until at least December 19, 2002,[2] and underwent the prescribed surgery on January 3, 2004. His insured status under Title II expired on March 31, 2004. This creates two time periods for consideration: December 19, 2002 until January 3, 2004, and January 3, 2004 until March 31, 2004.

A. Pre-Surgery

Plaintiff saw Dr. Randall Cross on December 19, 2002. Plaintiff indicated to Dr. Cross that he was working at the time but was experiencing palpitations and breathing difficulties upon exertion. Dr. Cross indicated these symptoms were related to Plaitniff's heart defect and that he needed surgery to repair the problem. However, because Plaintiff was "gainfully employed in a job that is not very physically demanding, and . . . he [is not] exhibiting such functional deficit at the present time that he would no longer be gainfully employable." R. at 159-60.

On June 5, 2003, Plaintiff began seeing Dr. Joseph Dwyer at the Branson Heart Center. Plaintiff told Dr. Dwyer that when his condition was originally diagnosed at age fifteen, he was told to avoid sports, not to overexert himself, and that he needed to have surgery by the time he reached age fifty-five or he might not survive. He indicated that "ordinary activity" did not cause shortness of breath and he was not experiencing increased fatigue, but he was experiencing occasional palpitations and discomfort. Dr.

---

[2]Plaintiff testified and submitted reports indicating he last worked in July 2001, and his earnings record does not reflect any earnings in 2002. However, in December 2002 he told Dr. Randall Cross that he had worked in "time share sales for resorts over the last 15 years, which is not a very physically demanding job and he is presently on a seasonal slow down. Otherwise, he has always been in a sales job of some sort throughout his adult life even to the present." R. at 159. Dr. Cross also wrote that Plaintiff "continues to be gainfully employed in a job that is not very physically demanding, and I do not feel that he is exhibiting such functional deficit at the presnet time that he would no longer be gainfully employable." The ALJ resolved this conflict by finding Plaintiff worked at least through December 19, 2002. R. at 23. It should be noted that Plaintiff's earnings record reflects no earnings for other years in which there is no doubt that he worked, R. at 102-04, and that his claim for benefits was not filed until November 13, 2002.

2

Dwyer ordered tests be conducted to determine the precise nature and circumstances surrounding the hole in Plaintiff's heart. R. at 177-78. On June 23, Dr. Dwyer ordered additional testing and discussed the possibility of surgery with another doctor at the Branson Heart Center (Dr. Narin Arunakul). R. at 176. Plaintiff saw Dr. Arunakul on September 15, 2003, and recommended Plaintiff undergo catheterization to rule out the possibility of coronary artery disease. R. at 174. Plaintiff's complaints following the catheterization were unchanged, and Dr. Arunakul indicated Plaintiff was "scheduled to go to Washington University for his percutaneous atrial septal defect patch." R. at 173. Plaintiff had second thoughts, and on November 25 Dr. Dwyer again encouraged Plaintiff to undergo the surgery. R. at 172.

Plaintiff testified that he stopped working because he felt weak and tired and was experiencing chest pain approximately once an hour. R. at 39. His job required him to show property to prospective timeshare buyers, and he found he needed to sit with his legs elevated (to slow his heartbeat) more and more often. R. at 40-41, 46. He also experienced serious problems with dizziness. R. at 42. He conceded his complaints to doctors where not consistent with his testimony and surmised it might be due to the extra stress at work. R. at 43. He estimated that he was able to walk twenty to thirty feet without needing to sit down, stand for ninety seconds without needing to sit down, and sit from ten to sixty minutes without needing to stand up (due to pain in his chest). R. at 44-45.

Dr. Sami Nafoosi testified as a medical expert. Dr. Nafoosi had not examined Plaintiff but had reviewed the records submitted prior to the hearing. He had not examined the records Plaintiff submitted at the hearing, but those records were summarized for him by the ALJ prior to the hearing (and off the record), and Plaintiff's counsel conceded the ALJ provided "a fair review of those records" for Dr. Nafoosi. R. at 35. Dr. Nafoosi clarified that his description of Plaintiff's functional limitations were divided into two time periods; namely, prior to surgery and after surgery. R. at 53. He opined that prior to the surgery, Plaintiff retained the ability to lift twenty-five pounds frequently and fifty pounds occasionally and had no other limitations. R. at 53, 58-59.

3

## B. Post-Surgery

Upon being discharged (one week after the surgery), Plaintiff was instructed to refrain from driving for a month, refrain from lifting more than ten pounds or engaging in any pushing or pulling movements for three months, and ambulate at least three times a day, gradually increasing the time spent walking to five to ten minutes. R. at 193. He was also prescribed various medications and advised to begin cardiac rehabilitations in three weeks. R. at 196. A hospital bed and walking cane were also prescribed. R. at 197-98. Testing performed on the day of his discharge indicated the effects of hypertension but less congestion than prior to the surgery. R. at 202. Plaintiff was also able to walk approximately 400 feet and his breathing (and oxygen saturation in his blood) were improved. R. at 226-27. On February 19, 2004, a colleague of Dr. Dwyer's (Dr. R. Randall Sukman) prepared a Medical Source Statement. It indicated Plaintiff could frequently lift ten pounds and occasionally lift approximately twenty-five pounds, stand and walk with the assistance of a cane for thirty minutes at a time and for a total of two hours a day, and sit (with feet elevated) for four hours at a time and a total of eight hours a day. He described Plaintiff's ability to push and pull as "moderately limited" due to pulmonary hypertension and indicated Plaintiff should avoid climbing, balancing, vibrations and heights. Dr. Sukman also warned that exertion would cause Plaintiff shortness of breath. R. at 214-17. On February 23, 2004, Plaintiff told Dr. Dwyer he was "only on aspirin and is doing well. No chest pain. His exercise capacity is improving steadily. . . . [T]he previous pulmonary hypertension . . . will decrease post operatively." R. at 263. On March 5, Plaintiff was prescribed Naprosyn and Darvocet for ongoing chest pain. R. at 285.

Plaintiff testified that following the operation his "heart doesn't beat as fast but it thumps now." His chest aches and standing often provides more relief than sitting. R. at 47. He was walking as instructed and had yet to begin cardiac rehabilitation. R. at 49-50. Dr. Nafoosi testified that Plaintiff was more restricted post-surgery than he was pre-surgery, but did not provide any particulars. R. at 54-55.

## C. The Vocational Expert

A vocational expert ("VE") testified in response to hypothetical questions posed by the ALJ. She testified that a person of Plaintiff's age, experience and education could return to past work as a salesman (both as normally performed and as actually performed by Plaintiff) even if limited to lifting ten pounds frequently and twenty pounds occasionally. R. at 62-63. Such a person could not perform their past relevant work if they were further limited in that they could stand for no more than fifteen minutes at a time and two hours total in a day – but that person could perform other work in the national economy, such as reservation clerk, order clerk, and classified ad clerk. R. at 63-64. However, if Plaintiff was required to sit with his legs elevated twenty to sixty minutes at a time four or five times a day, there would be no work he could perform. R. at 65. In response to questioning from Plaintiff's counsel, the VE testified a person with Plaintiff's experience and education could not perform any work if they were able sit for no more than ten minutes before needing to stand for five minutes and could not use their dominant hand while standing because they were using a cane. R. at 65-66.

Following the hearing, the ALJ submitted additional written questions to the VE. R. at 152-53; see also R. at 25-26 (reference to a "set of interrogatories . . . propounded to the vocational expert"). The VE was asked to assume person of Plaintiff's age, education and work experience who could lift ten pounds frequently and twenty pounds occasionally, stand and walk for thirty minutes at a time and two hours per day, sit for four hours at a time and eight hours a day, needed to have his legs elevated while sitting, needed to avoid climbing, balancing, crouching, or vibrating machinery, and required "rest every 2 hours for 10-15 minutes (this can be in conjunction with regularly scheduled breaks)." The VE indicates the standing restriction would preclude the person from returning to their past work as a timeshare sales representative, but the person could perform other work (namely, certain clerical jobs) in the national economy.

5

### D. The ALJ's Findings

The ALJ did not completely accept the medical expert's opinions, finding Plaintiff to be more limited than Dr. Nafoosi described in his testimony. He found that, prior to the surgery in January 2004, Plaintiff had the ability to lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand or walk for six hours, and sit for six hours out of an eight hour day. Following the surgery, Plaintiff is further restricted to lifting or carrying no more than twenty pounds occasionally and ten pounds frequently, standing or walking thirty minutes at a time and no more than two hours per day, sitting for four hours at a time and up to eight hours per day, and requires work breaks of ten to fifteen minutes every two hours. While sitting, Plaintiff must keep his legs elevated twelve inches. Plaintiff must avoid heights, crouching, and vibrations. R. at 25, 27. The ALJ found Plaintiff's testimony to be partially (but not completely) credible, based on (1) his contradictory statements to physicians and (2) the degree of physical activities he was able to perform prior to and after surgery, and (3) the medical evidence. The ALJ concluded Plaintiff could not return to his former work (because he could not meet the standing/walking requirements of that job), but retained transferable skills and the physical capacity to perform other work in the national economy.

### II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a

6

mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Plaintiff's Residual Functional Capacity

Plaintiff's arguments initially focus on Dr. Nafoosi's opinions. The problem with these arguments is they overlook the limited role Dr. Nafoosi's opinions played in the ALJ's final decision. The ALJ found Plaintiff to be more limited prior to the surgery than described by Dr. Nafoosi. More importantly, the bulk of Dr. Nafoosi's opinion related to Plaintiff's functional capacity prior to the surgery, and Plaintiff points to post-operative records to refute his opinion. With respect to Plaintiff's post-operative capabilities, it must be remembered Plaintiff needed to establish his disabled status existed on or before March 31, 2004. In ascertaining Plaintiff's residual functional capacity the ALJ relied heavily on the reports prepared by Plaintiff's treating doctors – including Dr. Sukman's Medical Source Statement. Indeed, the ALJ's written questions to the VE closely mirror Dr. Sukman's statement.

Plaintiff faults the ALJ for establishing the required height for his "leg elevation" to be twelve inches, contending nothing in his doctors' reports indicate this is a sufficient height. Of course, Plaintiff had (and has taken advantage of) numerous opportunities to augment the record, and has never provided anything clarifying the point. Plaintiff testified he elevated his legs while working prior to the surgery to relieve pressure on his heart: one can presume, then, that whatever height he kept his legs did not interfere with his ability to work. Additionally, a one-foot elevation for a person seated in a chair will place the legs at approximately horizontal; certainly, none of Plaintiff's doctors indicated he had to sit with his legs above his waist.

Finally, Plaintiff contends the ALJ erred in failing to include certain limitations in the hypothetical questions posed to the VE. In particular, he contends the questions should have mentioned the effects of congestive heart failure, hypertension, and other specific maladies. Plaintiff's contention is correct: the effects of these (and all other)

7

physical ailments should be included in the question to the VE.  However, Plaintiff has not demonstrated that they were not.  As noted earlier, the ALJ's findings about Plaintiff's residual functional capacity (and his questions to the VE) were based primarily on the records from Plaintiff's doctors – and principal among these was Dr. Sukman's Medical Source Statement.  For Plaintiff to prevail, he must demonstrate his doctors did not consider all of his physical ailments in offering opinions about his physical abilities.

As a final thought, the Court observes the ALJ should not propound hypothetical questions that include physical conditions; in other words, the ALJ should not have asked the VE whether a person with congestive heart failure can find work because a vocational expert cannot be expected to know the limitations imposed by a person's congestive heart failure.  The limitations imposed on a person by their physical ailments is a medical opinion; once established, determining whether a person with those limitations can perform work is a vocational opinion.

### B.  Plaintiff's Credibility

Plaintiff contends the ALJ failed to conduct a proper credibility analysis as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted).

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work

record, and observations by third parties and treating and
examining physicians relating to such matters as:

    1. The claimant's daily activities;
    2. the duration, frequency and intensity of the pain
    3. precipitating and aggravating factors;
    4. dosage, effectiveness and side effects of medication;
    5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

In large measure, Plaintiff again relies upon perceived flaws in Dr. Nafoosi's testimony, arguing those flaws should have been recognized and resulted in greater acceptance of his own testimony. Plaintiff's position is undercut by the ALJ's decision to disbelieve parts of Dr. Nafoosi's opinion based, in part, on Plaintiff's testimony: "[t]he medical expert's opinion is consistent with the evidence as a whole; however, based on the claimant's subjective complaints, I am finding that he has additional limitations." R. at 23.

Reconciling conflicts in the record is primarily the ALJ's task. Here, the ALJ considered and resolved conflicts between Plaintiff's testimony, Plaintiff's statements to doctors, statements from Plaintiff's doctors, and other evidence in the Record.[3]

---

[3]Included in this "other evidence" is a Report of Contact prepared by an employee of the Social Security Administration memorializing a conversation with Tina Moore (someone Plaintiff identified as having information about his condition. R. at 134). The Report of Contact indicates the contact was made on January 14, 2002 – or ten months before Plaintiff filed his application for benefits. Plaintiff contends this renders the information unworthy of belief. The Report of Contact also indicates it was prepared on January 14, 2003. This fact, combined with the fact that people out of habit commonly forget to utilize the proper year shortly after the new year has started, suggests the reference to January 14, 2002, is a scrivener's error.

Substantial evidence supports the ALJ's findings, and the Court is not empowered to review the matter de novo.

### C.  Failure to Consider New and Material Evidence

In proceedings before the Appeals Council, Plaintiff submitted additional evidence.  The Appeals Council considered that evidence but declined to review the case.  Therefore, the ALJ's decision (as amended by the Appeals Council to correct a typographical error, R. at 7) stands as the Commissioner's final decision.  In reviewing the decision to determine whether it is supported by substantial evidence in the record as a whole, the Court considers the evidence presented before the ALJ and the new evidence submitted and accepted after the ALJ rendered his decision.  E.g., Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

Most of the evidence submitted to the Appeals Council relates to Plaintiff's condition *after* his insured status expired at the end of March 2004 and does not affect the analysis of his condition during the relevant time period.  The remaining evidence consists primarily of duplicate copies of reports and records that had already been submitted to the ALJ.

### III.  CONCLUSION

The ALJ's determination Plaintiff was not disabled prior to the expiration of his insured status under Title II is supported by substantial evidence in the record as a whole.  Therefore, the Commissioner's final decision denying benefits is affirmed.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: July 14, 2006               UNITED STATES DISTRICT COURT

10

Case 6:05-cv-03573-ODS   Document 13   Filed 07/14/06   Page 10 of 10